IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>GARY W. DAY,<br><i>Individually and as Assignee of the Claims<br>of Hudson Insurance Company</i>,</td><td>*<br><br>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil Action No. PX-16-975</td></tr>
<tr><td>UNITED BANK,</td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
<tr><td></td><td>******</td><td></td></tr>
</table>

**MEMORANDUM OPINION**

Presently pending and ripe for resolution in this matter is Defendant United Bank's

Motion for Summary Judgment or to Dismiss Plaintiff's Third Amended Complaint. ECF No.

47. The matters are fully briefed and the Court now rules pursuant to Local Rule 105.6 because

no hearing is necessary. For the reasons stated below, Defendant's motion is GRANTED.[1]

## I.    BACKGROUND

In this action, Plaintiff Gary W. Day, both individually and as the assignee of the claims

of Hudson Insurance Company ("Hudson"), seeks to recover against Defendant United Bank,

formerly the Bank of Georgetown (the "Bank"). This matter centrally concerns certain lending

arrangements entered into between the Bank and a non-party government contractor, Persaud

Companies, Inc. ("PCI"). *See* ECF No. 38 ¶ 7.

Previously, the Bank moved to dismiss Day's Amended Complaint. *See* ECF No. 23.

Before the Court acted on the motion, Day filed a second Amended Complaint with the Court's

---

[1] Also pending is a consent motion for an extension of time for Defendant to file its reply in support of the motion, ECF No. 54, which likewise is granted.

approval.  *See* ECF Nos. 30, 31, 33.  The Court therefore denied the Bank's previous motion to dismiss as moot.  ECF No. 35.  The Court simultaneously granted Day an opportunity to file a Third Amended Complaint, ECF No. 35, and subsequently directed the parties to engage in limited discovery as to whether Day's claims were barred by limitations, ECF No. 40.  The Court granted the Bank an opportunity, following discovery, to move for dismissal or alternatively summary judgment.  ECF No. 40.  The Bank now brings that motion.

The facts as follows are taken from the third Amended Complaint.  (ECF No. 38.)  The lending agreement between PCI and the Bank, entered into in 2009, was secured by PCI's receivables for its government contracting work, among other assets.  ECF No. 38 ¶ 19.  The agreement provided that all funds paid by government departments and agencies for PCI's work would be paid directly into a bank account owned by the Bank.  ECF No. 38 ¶¶ 7, 20.  A second operating account was established with the Bank in PCI's name.  ECF No. 38 ¶ 20.  Each month, PCI would apply to the Bank to borrow money for its operations based on the amount in the Bank's account, and the Bank's assessment of PCI's finances.  ECF No. 38 ¶¶ 7, 20.  Initially the Bank filed formal written assignments of the contract funds with the Government, but at some point the formal assignments ceased, with PCI providing the Government the account number for the Bank's account for payment.  ECF No. 38 ¶¶ 8, 23.

In 2010, PCI and Hudson entered into an agreement pursuant to which Hudson issued payment and performance bonds for PCI's government projects.  ECF No. 38 ¶¶ 11, 25.  PCI did not inform Hudson of the above-described banking arrangement.  *See* ECF No. 38 ¶ 43.  In December 2010, PCI and its principal, Andy Persaud, executed a General Indemnity Agreement ("GIA") in favor of Hudson, which provided that all funds earned by PCI on bonded construction project funds would be trust funds for the purpose of paying PCI's obligations on its contracts.

2

ECF No. 38 ¶ 31. PCI did not notify Hudson of the nature of its lending relationship with the Bank, ECF No. 38 ¶ 33, and the Bank did not thereafter notify Hudson that the funds from PCI's projects were being deposited into the Bank's account, *see* ECF No. 38 ¶¶ 12, 13. Hudson alleges that the Bank's failure to file written notices of assignments with the Government and Hudson violated the Assignment of Claims Act.

Relying on the GIA, Hudson began issuing bonds for PCI's government projects. ECF No. 38 ¶ 34. Hudson alleges that it would not have issued bonds for PCI projects had it been aware of the details of PCI and the Bank's arrangement. ECF No. 38 ¶¶ 14, 35.

In late 2011, PCI requested that Hudson expand its bond program. ECF No. 38 ¶ 36. At that time, Hudson had not experienced any bond claim for PCI's projects. Nonetheless, Hudson required an amended GIA and an additional indemnitor, in light of Persaud's ongoing and contentious divorce. ECF No. 38 ¶ 36. Day agreed to execute the amended GIA as that second indemnitor. ECF No. 38 ¶¶ 37, 39. The parties also agreed that all funds from contracts relating to the GIA be run through a third-party administered escrow account, or "funds control." ECF No. 38 ¶ 37. The other relevant terms of the amended GIA remained the same. ECF No. 38 ¶ 40. Neither PCI nor Persaud disclosed the precise lending relationship with the Bank to Hudson or Day. *See* ECF No. 38 ¶ 38.

For a time, all was well with PCI, Hudson, and Day. Then, in the spring of 2012, PCI and Persaud began diverting funds from PCI's operating account with the Bank for non-business purposes. ECF No. 38 ¶ 15.[2] PCI's subcontractors and suppliers subsequently did not receive timely payment, and so made claims on the bonds issued by Hudson. ECF No. 38 ¶¶ 15, 41.

_____

[2] The Court notes that Persaud's diversion of funds could only happen once the funds were transferred into the PCI operating account and thus out of the Bank's custody and control in the Bank's account. The Court further notes that the third Amended Complaint nowhere alleges that the Bank itself wrongfully diverted the funds that the

In July 2012, Hudson demanded that PCI provide collateral security pursuant to the GIA. ECF No. 38 ¶ 42. PCI and Hudson entered into an agreement to satisfy Hudson's demand, the conditions of which PCI subsequently breached. ECF No. 38 ¶¶ 42–43. Hudson alleges that PCI committed this breach in order to conceal its with the Bank. ECF No. 38 ¶ 43.

In January 2013, Hudson filed an indemnity suit against PCI, Persaud, and Day in the Eastern District of Virginia. ECF No. 38 ¶ 44. During that case Hudson served subpoenas on the Bank, which led to the production of a number of documents, but none of the documents reflected the Bank-owned account into which PCI's contract funds had been deposited. ECF No. 38 ¶ 45. Based on the facts pleaded, it is not all clear how the Bank would have known that Hudson served as a surety on PCI's projects. Hudson and Day, however, learned of the exact banking relationship between the Bank and PCI on July 9, 2013, during the corporate designee deposition of the Bank in connection with the indemnity suit. ECF No. 38 ¶ 46.

The indemnity suit concluded with Hudson dismissing its claims against Day in exchange for a $1,700,000.00 payment, and assigning its claims against the Bank to Day. ECF No. 38 ¶ 50. In all, Hudson asserts that PCI's failure to pay subcontractors and suppliers led to $3,790,333.43 in payment and performance bond losses, net of the $1,700,000.00 paid to it by Day. ECF No. 38 ¶¶ 47, 48. Although Hudson succeeded in its indemnity claims against PCI and Persaud, neither Hudson nor Day are likely to collect on such claims because PCI is defunct and Persaud is believed penniless. ECF No. 38 ¶ 51.

In this action, Day brings claims for negligence against the Bank for its alleged failure to comply with the Assignment of Claims Act (Count I); violations of the Assignment of Claims Act (Count II); "Equitable Right to Recover Payments/Assignment of Claims Act" (Count III);

Government paid to the Bank's account, but rather allowed PCI to draw down on the funds pursuant to PCI's lending agreement with the Bank.

breach of trust (Count IV); constructive fraud (Count V); constructive trust (Count VI); conversion (Count VII); unjust enrichment (Count VIII); and accounting (Count IX). The Bank moves for summary judgment, alleging that Hudson (and therefore Day) was on inquiry notice as to the Bank's lending arrangement with PCI well before the relevant time period for limitations in this case, and in the alternative argues that all of Day's claims are subject to dismissal for failure to state a claim. For the reasons below, the Court agrees with the Bank that Day has failed to state a claim against the Bank for which relief can be granted, and further agrees that the facts as known to Hudson during the lending process sufficed to put Hudson on inquiry notice as to the Bank and PCI's lending arrangement.

## II.     STANDARD OF REVIEW

### A.  Motion to Dismiss

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint includes facts sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A plaintiff must plead facts to support each element of the claim to satisfy the standard. *See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). In so assessing, the Court takes as true all well-pleaded factual allegations and makes all reasonable inferences in the plaintiff's favor. *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court does not credit conclusory statements or legal conclusions, even when couched as allegations of fact. *See Iqbal*, 556 U.S. 678–79; *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

If a claim alleges fraud, or if the gravamen of a claim is fraud, the allegations must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Haley v.*

*Corcoran*, 659 F. Supp. 2d 714, 721 (D. Md. 2009). The rule requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, plaintiffs "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quotation marks and citation omitted). Fraud allegations that fail to comply with Rule 9(b) warrant dismissal under Rule 12(b)(6). *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).

The Court may consider materials attached to the complaint without transforming the motion to dismiss into one for summary judgment. *See* Fed. R. Civ. P. 10(c). The Court also may consider materials attached to a motion to dismiss, so long as such materials are integral to the complaint and authentic. *Philips*, 572 F.3d at 180; *see Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) ("[W]here a complaint in a fraud action references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint."). This rule seeks to prevent a "situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document . . . even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal marks and citation omitted).

### B. Summary Judgment

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).

Summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In

responding to a proper motion for summary judgment, the party opposing summary judgment

must present evidence of specific facts from which the finder of fact could reasonably find for

him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub*

*nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23). The party opposing

summary judgment "cannot create a genuine issue of material fact through mere speculation or

the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th

Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). If a party's statement of

a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the

Court credits the record over the averred fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    Discussion

### A.  The Anti-Assignment Act

At the outset, the Court notes that many of Day's claims implicate, in some fashion, the

Anti-Assignment Act, 41 U.S.C. § 6305.[3]  Under the Anti-Assignment Act, a "party to whom the

Federal Government gives a contract or order may not transfer the contract or order, or any

interest in the contract or order, to another party," and any such transfer "annuls the contract or

---

[3]     Day styles his claims as invoking the Assignment of Claims Act, 31 U.S.C. 3727, but cites to 41 U.S.C.
§ 6305 (formerly 41 U.S.C. § 15). These two provisions together are commonly referred to as the Anti-Assignment
Act. *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 892 (Fed. Cir. 2008) (citing *Fireman's Fund Ins.*
*Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002)). Although the two provisions of the Anti-Assignment Act
deal with different aspects of relationships and dealings with the government, "the concerns of the two statutes and
the legal concepts involved in their applicability are the same." *Id.* at 893–94 (Fed. Cir. 2008) (quoting *Tuftco Corp.*
*v. United States*, 614 F.2d 740, 744 n.4 (Ct. Cl. 1980)). Therefore, the Court will discuss the Anti-Assignment Act
generally, with the understanding that the analysis is equally applicable regardless of the specific provision invoked.

order so far as the Federal Government is concerned." 41 U.S.C. § 6305(a); *see Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 211 (4th Cir. 2001). Funding institutions such as the Bank may receive direct payments from government contracts, but the Bank must first file written notice of assignment with the relevant government agency and surety on any bond connected with the contract. *See* 41 U.S.C. § 6305(b). If the assignment provisions are violated, the Government may annul claims against the contract, so far as the Government is concerned, at its election, thus extinguishing an assignee's right to payment. *See Am. Gov't Props. v. United States*, 118 Fed. Cl. 61, 66 (2014); *Commerce Funding Corp.*, 249 F.3d at 211. Alternatively, the Government may waive the notice requirements by contract or "by acting consistently with the assignment through its course of conduct." *Am. Gov't Props.*, 118 Fed. Cl. at 66. In that case, the Government gives up its rights and remedies under the Anti-Assignment Act.

The primary purpose of the Anti-Assignment Act is two-fold: "first, to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government; and second, to enable the United States to deal exclusively with the original claimant instead of several parties." *Monchamp Corp. v. United States*, 19 Cl. Ct. 797, 801 (1990); *see Maffia v. United States*, 135 Ct. Cl. 604, 606 (1956) (Anti-Assignment Act "seems plainly designed to protect the United States from the assertion by parties other than the contracting party of rights under Government contracts"). It is against this backdrop that the Court will consider Day's claims.

### B. Subrogation

The doctrine of equitable subrogation also bears discussion before examining Day's claims. A surety who pays the debt of another is entitled to all the rights of the person on behalf

of whom the surety had paid claims in order to enforce the surety's right to be reimbursed. *Handex of Md., Inc. v. Waste Mgmt. Disposal Servs. of Md., Inc.*, 458 F. Supp. 2d 266, 274–75 (D. Md. 2006) (quoting *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962)). Subrogation "is an equitable remedy. It allows the Court to do that which ought to be done." *Id.* at 275. As "a creature of equity," subrogation "is enforced solely for the purpose of accomplishing the ends of substantial justice." *W. Cas. & Sur. Co. v. Brooks*, 362 F.2d 486, 490 n.18 (4th Cir. 1966) (quoting *Memphis & L.R.R. v. Dow*, 120 U.S. 287, 301–02 (1887)).

Through equitable subrogation, "the surety steps into the shoes of the principal obligor and is entitled to all of its rights relating to the . . . contract." *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) (internal marks omitted).[4] "[W]hen a surety meets its obligations on a contract bond by paying the claims of the laborers and materialmen, it subrogates to whatever rights the owner[,] . . . contractor, and laborers and materialmen had in the retained funds." *W. Cas.*, 362 F.2d at 489–90. When a surety performs a contract in place of the contractor, "he is subrogated to the rights of the obligee, and is entitled to the moneys unpaid so far as necessary to reimburse him for his loss." *Hartford Accident & Indem. Co. v. Coggin*, 78 F.2d 471, 478 (4th Cir. 1935). Critical to the Court's analysis, the rights for which a subrogee can recover are limited to those the subroger possessed at the time of subrogation. *See Lumbermens*, 654 F.3d at 1313 ("[S]tepping into the shoes of Landmark at the time of the default notice would not enable Lumbermens to assert a claim for damages . . . because Landmark itself would have no claim against the government for funds the government had already paid it under the contract (as opposed to a right to recover future payments)."); *In re Jones Constr. &*

---

[4]     A payment bond surety that discharges a contractor's obligation to pay a subcontractor is equitably subrogated to the rights of both the contractor and the subcontractor. *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007).

*Renovation, Inc.*, 337 B.R. 579, 583 (Bankr. E.D. Va. 2006) (when a contractor defaults on its

obligations and a surety either completes the work under the contract or pays related bills, the

surety has a right to the payments due to the contractor).

Day alleges that by virtue of Hudson's performance on the bonds issued to PCI, Hudson

is subrogated to the rights of subcontractors and suppliers for reimbursement. This is supported

by the doctrine of equitable subrogation. But Day further alleges that Hudson is subrogated to

the rights of the Government, not with respect to an interest in retained or unpaid funds, but

rather in such a manner that Day can assert claims by the Government against the Bank.

The Court cannot identify authority from any source conferring such a right. Hudson

performed its obligations under the bonds, and Day undoubtedly has the right to maintain claims

for sums retained by the Government or otherwise owing to PCI. More than this, however, is not

supported by the doctrine of equitable subrogation or any reasonable inferences drawn from the

third Amended Complaint. *See Hanover Ins. Co. v. Corrpro Cos., Inc.*, 312 F. Supp. 2d 816, 823

(E.D. Va. 2004) ("Hanover does not direct the court to any case, nor can the court locate one on

its own, in which the surety under a performance bond, upon discharging its contractual

obligation to the obligee, was permitted to assert claims against an entity other than the obligee

of the surety agreement by 'standing in the shoes' of the principal. Suretyship law simply does

not contemplate the type of equitable assignment of claims that Hanover asserts it does."). The

Court, therefore, will assess the particular claims asserted with these principles of subrogation

animating the analysis. To the extent that Day's claims rely on asserting rights of the

Government against the Bank, the claims cannot be supported.

### C. Motion to Dismiss

The Court next turns to Day's claims against the Bank.

## 1. Negligence (Count I)

In Count I, Day asserts that Bank negligently failed to comply with the notice provisions of the Anti-Assignment Act, which caused losses to Hudson and Day because of the claims made under the bonds issued on PCI's projects. To bring an action in negligence, the plaintiff must plausibly establish that (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the breach was the legal cause of the harm the plaintiff suffered; and (4) damages. *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 531 (1986).

Day seeks to recover for purely economic loss in the form of money paid under the GIA. The economic loss doctrine bars recovery for purely economic losses in negligence, unless "an independent duty" and an "intimate nexus" exist between the parties. *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 900 (D. Md. 2015). "The economic loss doctrine represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611 (2017).

Day claims that the Bank breached its duty to provide Hudson with notices of assignment as required by the Anti-Assignment Act. ECF No. 38 ¶ 54. In addition, Day asserts that the Bank was under a general "common law duty to use due care in its banking dealings," ECF No. 53 at 31. Day contends that this is sufficient to overcome the economic loss doctrine in this case. Construing the allegations of the third Amended Complaint most favorably to Day, no sufficiently intimate relationship between the Bank and Day or Hudson exists to allow Day to recover on a negligence claim here.

First, the Bank's duty to perform a statutory obligation does not necessarily give rise to a duty of care owed in tort. No doubt, statutory violations "may be considered as some evidence

11

of negligence when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was the type the statute was designed to prevent." *Erie Ins. Co. v. Chops*, 322 Md. 79, 84 (1991) (citing *Pahanish v. Western Trails, Inc.*, 69 Md. App. 342, 362 (1986)). But "a 'tort duty' does not necessarily coexist with a moral duty, or with a duty imposed by contract, *or even with a duty imposed by statute*." *Id.* (citing *Jacques*, 307 Md. at 531–34) (emphasis added).

More importantly here, the statute in question does not imbue the Bank with a tort duty toward sureties. The Anti-Assignment Act "protects the Government from secret assignment arrangements, to prevent possible multiple claims, and to make unnecessary the investigation of alleged assignments. Thus the government knows with whom it is dealing, and is protected against the potential of duplicate claims." *Am. Gov't Props.*, 118 Fed. Cl. at 66 (internal marks and citations omitted); *see United States v. Shannon*, 342 U.S. 288, 291 (1952) (Anti-Assignment Act designed "to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant" (quoting *United States v. Aetna Sur. Co.,* 338 U.S. 366, 373 (1949)). Consequently, failure to file written assignments either nullifies the assignment with respect to the Government or, if the assignment nonetheless is accepted by the Government, has no effect. But a lending institution's failure to file a written assignment does not create rights or remedies for a party other than the Government.

Day contends that because the written notice must be made to the sureties too, then the Bank's failure creates a tort duty here. In support, Day relies on *New Amsterdam Casualty Co. v. Manufacturers & Traders Trust Co.*, 330 F.2d 575 (2d Cir. 1964), in which the Second Circuit reasoned that,

. . . Congress intended sureties to derive some advantage from getting notice of an assignment; otherwise the requirement is meaningless. Obviously the purpose of requiring notice is to afford the surety some protection against dissipation of moneys due or to become due from the government. It is equally plain that a surety has an interest in learning of an assignment, because of the bonds it is required to furnish pursuant to the Miller Act.

*Id.* at 576; *see also Cent. Nat. Ins. Co. of Omaha v. Tri-Cty. State Bank*, 823 F. Supp. 652, 656 (D. Minn. 1993); *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 290 F. Supp. 664, 667 (D. Mass. 1968), *aff'd*, 411 F.2d 843 (1st Cir. 1969), *on reh'g*, (1st Cir. May 5, 1969). Day argues that this, along with the Bank's "independent common law duty to use due care in its banking dealings," provides a sufficient "intimate nexus" to maintain a negligence claim for purely economic loss. ECF No. 53 at 31. This argument fails for two reasons.

First, the Court does not consider it settled that Hudson is a member of the class intended to be protected by the Anti-Assignment Act, especially as to a lending institution. To be sure, it logically follows that sureties would benefit from notice of assignment so as to track payments that, in part, should be used to pay subcontractors. But the Court cannot conclude that the injury suffered by Hudson is the sort of injury the Anti-Assignment Act was *designed to prevent*. *See supra* Section II.A. Rather, the law "is for the protection of the United States only." *Hegness v. Chilberg*, 224 F. 28, 33 (9th Cir. 1915); *see Arthur Pew Const. Co., Inc. v. Lipscomb*, 965 F.2d 1559, 1576 (11th Cir. 1992) ("The assignment statutes are for the protection of the government. They do not regulate the rights of parties to an assignment. Whether or not an assignment is valid as against the United States, it is effective and binding on the parties." (internal citation omitted)). This is especially true when considering that the Government may elect to waive the protections of the Act at its discretion, regardless of whether a surety received the notice owed to it by statute. *See Am. Gov't Props.*, 118 Fed. Cl. at 66 (requirements of § 6305(b) may be

abrogated by agreement between the government and the original contractor; otherwise, if requirements are not met, claims against the contract are annulled "at the government's option"); *United Pac. Ins. Co. v. Timber Access Indus. Co.*, 277 F. Supp. 925, 928–29 (D. Ore. 1967) (Anti-Assignment Act "was enacted for the benefit of the United States and if the United States recognizes the assignment, the parties are not in a position to object").

Second, even if Day's argument in this regard were correct, violation of a statute is evidence of negligence but does not automatically give rise to the type of relationship necessary to overcome the economic loss rule. *Cf. Balfour*, 451 Md. at 611–12 (economic loss doctrine applies in the absence of privity, physical injury, or risk of physical injury). Here, the Court finds that an alleged general duty by the Bank to exercise due care in its bank dealings does not fill the gaps. To hold otherwise would render banks subject to suit in negligence any time an aggrieved plaintiff could marshal evidence of violation of a banking regulation which caused loss to the would-be plaintiff. The economic loss rule, simply put, would be swallowed by the exception.

The cases on which Day relies in fact underscore this point. *Jacques v. First National Bank of Maryland*, for example, *see* ECF No. 53 at 32–33, concerned the duties arising between a bank and its customer. 307 Md. at 528 ("This appeal presents the issue of whether a bank that has agreed to process an application for a loan owes to its customer a duty of reasonable care in the processing and determination of that application."). The Maryland Court of Appeals began the analysis by focusing on the nature of the relationship between the bank and the customer whose loan application it had agreed to process. *Id.* at 528, 537. Despite the defendant bank's contention that no contract existed between it and the plaintiffs, the court concluded that the bank had made at least two express promises to the plaintiffs, and that those promises were enforced

by consideration. *Id.* at 537–38. The court contrasted these particular facts with the more routine submissions of loan applications that would not have triggered a duty. *Id.* at 538–39. Only because the defendant bank had agreed to process the loan application (which contained "rather extraordinary" provisions) did a duty of reasonable care arise. *Id.* at 540–41. The court then considered "the nature of the business of the party upon whom the burden is sought to be imposed" as an additional factor relevant to determining whether a tort duty existed. *Id.* at 541. The court noted that "contractual dealings with professionals such as physicians, attorneys, architects, and public accountants" may give rise to a tort duty. *Id.* The court observed that banking "is affected with the public interest," *id.* at 542, and that this, in light of the circumstances of that case, allowed for the recognition of a tort duty, *id.* at 543.

In this case, the Bank has no customer relationship or any other contract-like relationship with Hudson or Day. Indeed, based on the third Amended Complaint, it is not clear that the Bank even knew of Hudson's existence during its relationship with PCI. *Jacques* thus undermines rather than supports Day's argument.

Day's reliance on *Chicago Title Insurance Co. v. Allfirst Bank*, *see* ECF No. 53 at 32–34, fares no better. *Chicago Title* centered on "whether a depositary bank is liable in negligence to a non-customer drawer of a check." 394 Md. 270, 274 (2006). In answering the question in the affirmative, the court observed that the relationship between the bank and the drawer, in the context of that particular case, amounted to the *equivalent* of a contractual relationship. *See id.* at 377–82, 383 n.22.

Contrary to Day's assertion, the court expressly rejected the notion that the bank generally had a tort duty to the drawer of a check (or to non-customers in general). *Id.* at 383 n.22; *see id.* at 383. Rather, the *Chicago Title* court conducted a fact-specific analysis, and was

15

careful not extend its holding beyond the atypical circumstances of the case. *See generally id.* at 381–83 & n.22. Specifically, the court reasoned that the bank's actual knowledge of a third party's reliance on the defendant's action was important in determining whether a duty of due care arose, and that the bank was aware of inconsistencies in the check's endorsement and other discrepancies during the transaction that should have prompted the bank to exercise caution. By contrast, no direct course of dealing at all took place between the Bank and Hudson. Consequently, no facts exist to demonstrate that the Bank had any duty to exercise caution for Hudson's benefit. Apart from their misfortune of both entering into business relationships with PCI and both having been harmed by PCI and Persaud's misappropriation of funds, nothing connects Hudson and the Bank. No facts evidence a sufficiently intimate relationship between Hudson and the Bank to give rise to a duty of care.[5] Count I is dismissed.

### 2. Count II (Violation of Assignment of Claims Act)

In Count II, Day attempts to bring a freestanding claim for the Bank's violation of the Anti-Assignment Act. However, even if the Court accepts as true that the Bank violated the Act, it simply does not give rise to a cause of action here. At the outset, it bears noting that Day has given this Court no authority whatsoever that it can sue the Bank for this statutory violation, either directly or through subrogation. This is for good reason. As noted above, a lending institution's failure to file a written assignment legally ends in one of two ways. Either the Government may elect to declare the assignment to the violating institution null and void; or by words and deeds, the Government can assent to the assignment. In either case, it is the

---

[5]    Day also refers the Court to *Glanzer v. Shepard*, 233 N.Y. 236 (1922). *Glanzer* involved the duty of a weigher of beans toward a buyer of beans who used the bean-weigher's services. *See id.* at 238. The seller paid for the weigher to certify the weight of the beans, with a copy of the certificate furnished to the buyer. *Id.* The weigher had certified the incorrect weight, and the New York Court of Appeals found the weigher liable to the buyer, even though the weigher was in privity of contract with the seller. The court reasoned that the buyer's "use of the certificates was not an indirect or collateral consequence of the action of the weighers" but rather "was the end and aim of the transaction," and, "[g]iven the contract and the relation," a duty was imposed. *Id.* at 239. This Court declines to follow *Glanzer*. It is factually inapposite, nonbinding, and not persuasive.

Government who may exercise legal rights under the Act, not any other entity. Likewise, it is the Government which can waive its rights by accepting the terms of the assignment in the absence of written assignment being filed.

As discussed above, Hudson is not subrogated to the Government's rights against the Bank under the Anti-Assignment Act. *See supra* III.B. But even if it were, the Government would not have had a freestanding claim against the Bank on the facts as pleaded. The third Amended Complaint makes plain that the Government paid the funds in question to the Bank's account. The Government was given the bank account number and transferred the funds to the Bank when the work had been performed. It is also undisputed that the funds in question were ultimately transferred to the PCI operating account prior to Persaud diverting the funds wrongfully. On these facts, where the Government paid into the Bank's account for the work PCI had already performed, the Court is hard-pressed to find a cause of action that can lie on behalf of the Government. Regardless, Day cannot seek relief for the Bank's purported violation of the Anti-Assignment Act. Count II is dismissed.

### 3. Count V (Constructive Fraud)

In Count V, Day claims that because the Bank "breached its duties to notify Hudson" that the Bank had been assigned PCI's receivables, and because the Bank "breached its duties to Hudson and Day to hold all bonded contract trust funds for the benefit of subcontractors and suppliers," Day has a right to relief under a theory of constructive fraud. ECF No. 38 ¶¶ 77–79. To state a claim for constructive fraud, a plaintiff must show "that the defendant breached a legal or equitable duty by deception or by violating a confidence." *Chassels v. Krepps*, 235 Md. App. 1, 16 (2017), *cert. denied*, 457 Md. 677 (2018) (citing *Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 69–70 (2015)). "The duty generally arises in a context of trust or confidence, such

as a fiduciary duty or confidential relationship." *Id.* If a defendant breaches such a duty by deceptive conduct, the party's state of mind is irrelevant. *Id.*; *see Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 236 n.11 (1995). However, "[m]ere non-compliance with a legal duty is not necessarily constructive fraud." *Chassels*, 235 Md. App. at 16; *see Scheve v. McPherson*, 44 Md. App. 398, 407 (1979); *Hanley v. Doctors Exp. Franchising, LLC*, Civil Action No. ELH-12-795, 2013 WL 690521, at *18 (D. Md. Feb. 25, 2013) (quoting *Scheve*). Despite the lack of a scienter requirement, "[c]onstructive fraud is nonetheless fraud, a most serious charge. It is therefore not lightly found by the courts." *Scheve*, 44 Md. App. at 406 (quotation marks and citation omitted).

The "prerequisite" to a constructive fraud claim "is a confidential relationship, a relationship in which dominion or influence is exercised by one person over the other." *Chassels*, 234 Md. App. at 16 (internal marks and citation omitted); *see UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 517 (2014), *aff'd*, 443 Md. 47 (2015) (constructive fraud can be applied in tax and lending cases where a confidential relationship exists); *see also Thompson*, 443 Md. at 69 ("For constructive fraud's purposes, a defendant owes an equitable duty to a plaintiff where the parties are in a confidential relationship."); *but see Hanley*, 2013 WL 690521, at *19 (finding that constructive fraud can arise outside of a confidential relationship if a legal duty is breached, where that breach has a tendency to deceive others, to violate public or private confidence, or to injure public interests). "A confidential relationship is one in which two persons stand in such a relation to each other that one *must necessarily* repose trust and confidence in the good faith and integrity of the other." *UBS Fin. Servs.*, 217 Md. App. at 517 (internal marks omitted, emphasis added) (citing cases); *Midler v. Shapiro*, 33 Md. App. 264, 268 (1976) ("A confidential relationship exists whenever confidence is placed by one person in

another and accepted by that other person.")).  Where businesses are engaged in an arm's length transaction, a confidential relationship does not exist.  *Hanley*, 2013 WL 690521, at *18.

Taking all facts pleaded in the third Amended Complaint as true, no confidential relationship between Hudson or Day and the Bank existed.  Further, as discussed in the context of Day's negligence claim, the Court does not find that the Bank owed Hudson or Day, or any other surety, a special duty.  Indeed, from the third Amended Complaint, it is not plausible to infer any relationship, let alone one of confidence and trust, between Day, Hudson, and the Bank sufficient to support a claim for constructive fraud.

However, even if Day could somehow overcome this hurdle, the Bank's "noncompliance with [the legal duty]" to provide notice under the Anti-Assignment Act is insufficient to give rise to a constructive  fraud claim.  *See Scheve*, 44 Md. App. at 407.  Before Hudson and PCI entered into their agreement, the Bank had no obligation to provide Hudson with any form of notice; it is unclear how the Bank's failure to comply with its legal duty—not yet owed to Hudson—could tend to deceive Hudson at that point in time.  It also was well within Hudson's power to discover the lending arrangement between PCI and the Bank without recourse to the Anti-Assignment Act; Hudson could have requested additional information from PCI and the Bank, like it ultimately did during litigation.  Indeed, Hudson could have so inquired at the moment it began to receive claims based on unsatisfied PCI obligations.  Certainly, Hudson cannot shift its responsibility to protect its own business interests at the inception of its deal with PCI to the Bank.  Nor can the Court conclude that the Bank's failure to comply with the notice requirement "violated public or private confidence" or "injured public interests."

To hold otherwise would mean that any time a surety fails to conduct its due diligence, and broadly relies on an assumption that all third parties have complied with every statutory

provision that could adversely affect the business entity's interest in the contract, the surety could sue in fraud. The Court cannot in good conscience extend tort law in this fashion. *Cf. Hanley*, 2013 WL 690521, at *19 (finding "no basis to muddy the waters with a constructive fraud tort claim" in part because parties cited no opinion in which Maryland courts had held that a particular statutory duty or any analogous duty could give rise to a constructive fraud claim). Count V is dismissed.

### 4. Count VII (Conversion)

To maintain a claim for conversion, a plaintiff must demonstrate (1) a "distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it," and (2) "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 463 (2017) (internal formatting and citations omitted). In general, conversion is restricted to tangible property, and money cannot be subject to a conversion claim. *See Roman v. Sage Title Group, LLC*, 229 Md. App. 601, 609 (2016). An exception to this exists when "the defendant converted *specific segregated or identifiable funds*"; under such circumstances, a conversion claim may lie. *Id.* (quoting *Allied Investment Corp. v. Jasen*, 354 Md. 547, 564 (1999)). But, if converted funds have been commingled with other funds rendering the process of disaggregation impossible, then recovery for conversion is unavailable. *Id.*

With these legal principles in mind, Day's conversion claim fails. First, viewing the facts as pleaded most favorably to Day, the Bank did not convert the funds, PCI did. At the time the funds were in the custody or control of the Bank in the Bank's account, the funds were not yet owed to subcontractors to which the surety is connected. Only after PCI requested payment to the Bank to satisfy outstanding obligations to PCI subcontractors were the funds released. Nor

does the third Amended Complaint plead any facts by which the Court could reasonably infer that the Bank knew or should have known about Persaud's diversion of the funds. Persaud, not the Bank, retained custody of and diverted the funds. *See Estate of Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 330 (D. Md. 2012) (no conversion claim against a party who did not "play[ ] any role in or even [know] of the financial transactions" alleged to be wrongful, and only took money and property that was lawfully owed for services rendered; conversion claim may lie against parties who in fact engaged in wrongful and/or fraudulent transactions leading to the loss). But for Persaud's dissipation of the funds, Day would have had no complaints. Accordingly, no reasonable reading of the third Amended Complaint could support a theory of conversion with the Bank as wrongdoer.

Second, even if Day could maintain a claim against the Bank for conversion, it is utterly implausible that any funds to which Hudson or Day may have a claim were not commingled with other funds. The Bank's receipt of funds from PCI's projects spans at least three years, and all funds from all of PCI's government projects were deposited into the same account. ECF No. 38 ¶ 7. Only some subset of these projects were bonded by Hudson, and only on some subset of the Hudson-bonded projects did Hudson pay claims. *See* ECF No. 38 ¶¶ 11, 48. Because the funds most plausibly were commingled, and the third Amended Complaint does not provide a basis to infer that the funds were segregated, Day has failed to state a claim for conversion against the Bank. *See John B. Parsons Home, LLC v. John B. Parsons Foundation*, 217 Md. App. 39, 61–62 (2014) (when there was no allegation that allegedly converted funds were not subsequently commingled, and a period of nine years passed from the commencement of payments to the time of the action, trial court did not err in concluding that the passage of time "inevitably resulted in the commingling of the funds"); *Roman*, 229 Md. App. at 611 (citing *John B. Parsons*); *see also*

*Lasater v. Guttmann*, 194 Md. App. 431, 447 (2010) (once monies were commingled, "they lost their separateness for purposes of a conversion claim"). Count VII is dismissed.

### 5. Count VIII (Unjust Enrichment)

The third Amended Complaint likewise fails to state a claim for unjust enrichment. Unjust enrichment "is a legal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 599 (D. Md. 2018) (internal marks omitted); *see Chassels* 235 Md. App. at 17 ("Unjust enrichment is an obligation which the law creates in absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it." (quotation marks omitted)).

To state a claim for unjust enrichment, a plaintiff must plausibly aver: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant "under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Montgomery Cty. v. Managed Care Innovations, LLC*, 261 F. Supp. 3d 567, 576 n.9 (D. Md. 2017) (quotation marks omitted). "[T]he classic measure of unjust enrichment damages is the gain to the defendant, not the loss by the plaintiff." *Chassels*, 235 Md. App. at 18.

In this case, no facts pleaded in the third Amended Complaint suggest that Day or Hudson conferred a benefit upon the Bank. Instead, Day and Hudson conferred a benefit on *PCI.* Therefore, Day's unjust enrichment claim fails at the outset. Nor was the Bank unfairly

conferred a gain. Rather, the Bank-controlled account acted as a pass-through for the funds which the Government paid, and which ultimately landed in PCI and Persaud's hands before Persaud engaged in his wrongful diversion. Again, if an unjust enrichment claim can lie, it lies against Persaud and PCI, not the Bank. Count VIII is dismissed.

### 6. Counts III, IV, VI, IX (Requests for Equitable Relief)

In Count III, Day alleges that the Bank's "direct receipt of government and agency project funds was . . . violative of the GIA" entered into by PCI and Hudson and that it "subjected Hudson to substantial enhanced risk in issuing bonds on behalf of PCI." ECF No. 38 ¶ 67. On this basis, and because PCI failed to provide notices as required by the Anti-Assignment Act, Day argues that Hudson "has the equitable right to recover the payments made to" the Bank. ECF No. 38 ¶¶ 67–69.

In Count IV, Day purports to bring a claim for "Breach of Trust," alleging that the Bank's receipt of funds paid out under government contracts—which by agreement between PCI and Hudson were to be held in trust—renders it a trustee in fact, and that Day has the right to "recover from [the Bank] all sums paid to the [Bank's] Account that were not paid to PCI's subcontractors and suppliers." ECF No. 38 ¶¶ 71–75. In Count VI, Day alleges that the Bank's receipt of PCI's proceeds on government projects was "in violation of the Federal Assignment of Claims Act," and that because the Bank violated its obligations under that Act and because Hudson performed as a surety, "Hudson and its indemnitor Day have a higher equitable call on the proceeds." ECF No. 38 ¶¶ 81–83. In light of this, Day alleges he can recover under a "Constructive Trust." ECF No. 38 ¶ 84. Finally, in Count IX, Day requests an accounting of all of the Government payments received by the Bank for each of PCI's contracts that were bonded by Hudson. ECF No. 38 ¶ 92.

These four counts, either explicitly or in effect, are requests for the Court to grant equitable relief to Day.[6] "[E]quity is fundamentally a question of the Court's discretion." *Flame S.A. v. Indus. Carriers, Inc.*, 24 F. Supp. 3d 493, 512 (E.D. Va.), *aff'd sub nom. Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352 (4th Cir. 2014); *see Am. Fed'n of Labor v. Watson*, 327 U.S. 582, 593 (1946) ("The power of a court of equity to act is a discretionary one."); *Neese v. Johanns*, 450 F. Supp. 2d 632, 638 (W.D. Va. 2006), *aff'd*, 518 F.3d 215 (4th Cir. 2008).

"[A]lthough existing legal entitlements are important factors in formulating an equitable decree, such legal rights must give way in some circumstances to broader equitable considerations." *Idaho ex rel. Evans v. Oregon*, 462 U.S. 1017, 1025 (1983). "Principles of equity require that justice is done to all parties, and that this Court not hastily reach a result which is inequitable to one of the litigants." *Steyhr Daimler Puch of Am. Corp. v. Pappas*, 35 B.R. 1001, 1004 (E.D. Va. 1983). "[A] court of equity will not transfer a loss that has already fallen upon one innocent party to another party equally innocent." *Holly v. Domestic & Foreign Missionary Soc. of Protestant Episcopal Church*, 180 U.S. 284, 295 (1901).

### a. Equitable Right to Recover and Trust

Day's assertion that the Bank's receipt of project funds "was violative of the GIA," using the passive voice, is telling. Nowhere does Day plead facts to support that the Bank knew or should have known of Hudson's relationship with PCI or that the funds that the Government paid

---

[6]     Both Day's "Breach of Trust" count and "Constructive Trust" counts sound in equity. *See In re A.H. Robins Co., Inc.*, 880 F.2d 769, 776 (4th Cir. 1989) ("Matters relating to the control and supervision of trusts are within the equity jurisdiction of the court."). First, as to the purported "Constructive Trust" count, "a constructive trust is a remedy, not a claim unto itself." *Chassels*, 235 Md. App. at 15. "A constructive trust is a fiction imposed as an equitable device for achieving justice." *Healy v. C.I.R.*, 345 U.S. 278, 282 (1953). Second, as to Day's "Breach of Trust" count, under Maryland law "a claim for breach of fiduciary duty exists only where the breach is alleged as an element of the cause of action—not as a separate cause of action itself." *Boiardi v. Freestate*, Civil Action No. ELH-11-01676, 2013 WL 5410131, at *5 (D. Md. Sep. 25, 2013) (quotation marks omitted); *see Adobe Sys. Inc. v. Gardiner*, 300 F. Supp. 3d 718, 726 (D. Md. 2018). Count IV is a standalone claim for breach of trust, and does not allege this breach as an element of any other claim. Indeed, the details of this count as pleaded belie its equitable nature. *See* ECF No. 38 ¶¶ 73, 74 (describing the Bank as a "trustee in fact" or "trustee ex maleficio"). As such, any remedy available under this count would be equitable.

PCI were "trust" funds under the agreement to which the Bank was not a party. Rather, Day asserts in a conclusory fashion that the Bank, "[a]s a lender experienced in government contracting," simply should have known "that the funds entering the [Bank's] Account were trust funds." ECF No. 38 ¶ 72. The Court will not accept legal conclusions couched as factual assertions. And it is utterly unclear how the Bank—which was *not* a party to the GIA entered into by PCI and Hudson—can violate the GIA in a manner that would render it a trustee. *See Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 605 (4th Cir. 2010) ("If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest . . . free of the trust, and is under no liability to the beneficiary." (quoting Restatement (Second) of Trusts § 284(1)); *Phillips Way, Inc. v. Presidential Fin. Corp. of Chesapeake*, 137 Md. App. 209, 220 (2001) ("The beneficiary has a right that no third person shall *knowingly* aid the trustee in committing a breach of his duties." (internal alteration omitted, emphasis added) (quoting George G. Bogert, *The Law of Trusts and Trustees*, § 868 at 103–04 (Rev.2d ed. 1983)); *Safe Deposit & Trust Co. v. Cahn*, 102 Md. 530, 62 (1906) ("It is a general principle that all persons who *knowingly take part or aid in committing a breach of trust* are responsible for the money thus withdrawn from the trust estate." (emphasis added)).

Day does not have an equitable right to recover from the Bank, and the imposition of a constructive trust is not warranted. "A constructive trust is an equitable remedy" that "may be imposed by the court where property was acquired through an improper method or a breach of a confidential relationship, or where there is a higher equitable call on that property by the complaining party." *Chassels*, 235 Md. at 15–16 (quotation marks and citation omitted). As

noted previously, no breach of a *confidential* relationship occurred here. Nor can the Court determine that Day's equitable call to the funds is greater than the Bank's. *See Reliance Ins. Co. v. U.S. Bank of Wash., N.A.*, 143 F.3d 502, 507–08 (9th Cir. 1998) (between a lender who received payments from the government without fraud and a surety who paid out on bonds, equities as to the money already disbursed to lender were equally strong on both sides, both were "more or less innocent victims," and court would not divest money from lender). Any wrongful misuse of trust funds was PCI and Persaud's doing, not the Bank's. *See Hess v. Kafka*, 221 F. Supp. 3d 669, 673 (D. Md. 2016) ("Ordinarily, a constructive trust must be established from circumstances surrounding the inception of the transaction and not from subsequent events." (quoting *Wimmer v. Wimmer*, 287 Md. 663, 672 n.3 (1980)); *see also Holly*, 180 U.S. at 287–89, 294–95 (when a defendant did not have notice of the third party's dishonest conduct and applied the money to agreed-upon ends, "a court of equity would refuse to hold [that defendant] as a trustee *ex maleficio*" and the plaintiff "has no equities" as against the defendant).

Accordingly, the Court will not shift to the Bank the losses caused by Persaud and PCI. Rather, Hudson and Day could and did seek equitable relief from those parties. ECF No. 38 ¶ 51. That Persaud may be judgment proof does not entitle Day and Hudson to recover from the Bank. *See Estate of Jones*, 903 F. Supp. 2d 323; *Reliance Ins. Co.*, 143 F.3d at 507–08 . Hudson and Day do not have an equitable right to recover from the Bank, and the Bank was not rendered a trustee by virtue of its receipt of government funds. Counts III, IV, and VI are dismissed.

### b. Accounting

An accounting is an equitable remedy. *See P.V. Props., Inc. v. Rock Creek Vill. Assocs. L. P.*, 77 Md. App. 77, 89 (1988). "An accounting may be had . . . where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an

account." *Id.* A court may "award an accounting between parties when there are involved mutual accounts or accounts of such complication that it is not practicable to try the case at law before a jury." *Broderick v. Am. Gen. Corp.*, 71 F.2d 864, 867 (4th Cir. 1934). As discussed above, there is no confidential or fiduciary relationship between the parties, and as such, Day has no right to an accounting. Count IX is dismissed.

### D. Dismissal With Prejudice

Whether to dismiss the third Amended Complaint with prejudice is a question is committed to the discretion of the Court. *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825–26 (D. Md. 2013). "[A]n unqualified dismissal is entirely proper when the court has reviewed the claim and found it to be substantively meritless." *McLean v. United States*, 566 F.3d 391, 400–01 (4th Cir. 2009). Additionally, leave to amend may properly be refused when the plaintiff has repeatedly failed to cure deficiencies or if amendment is futile. *See Morefield v. Bailey*, 959 F. Supp. 2d 887, 907 (E.D. Va. 2013).

This is Day's fourth complaint. Not only has Day been given repeated chances to cure deficiencies, but nothing currently before the Court suggests that, if given another opportunity, Day would be able to resurrect his claims. Therefore, dismissal of all claims is with prejudice.

### E. Motion for Summary Judgment

Alternatively, the Court notes that the Bank would be entitled to summary judgment on limitations grounds because Hudson was on inquiry notice of the Bank and PCI's lending arrangement by no later than October 2011, when Hudson, Day, PCI, and Persaud entered into the amended GIA. Pursuant to the discovery rule, a cause of action accrues when a plaintiff knew or reasonably should have known of the defendant's acts or omissions giving rise to the claims. *Poffenberger v. Risser*, 290 Md. 631, 636 (1981). "[N]otice of facts which would incite

a person of reasonable prudence to inquire is notice of all facts which reasonably diligent inquiry would develop." *In re Klein Moffett Co.*, 28 F.2d 523, 525 (D. Md. 1928); *see Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 90 (2006). "[T]he law imputes knowledge when opportunity and interest, coupled with reasonable care, would necessarily impart it." *Nettles v. Childs*, 100 F.2d 952, 957 (4th Cir. 1939).

As of October 2011, Hudson was sufficiently concerned about the state of PCI and Persaud's finances to require an additional indemnitor on the GIA, and that all "funds from contracts relating to the GIA" be placed in a third-party escrow account. ECF No. 38 ¶¶ 36, 37. Hudson also had in its possession information reflecting a UCC filing by the Bank, and showing that PCI owed the Bank $1.3 million on its line of credit. *See* ECF No. 53-1 at 5 (Hudson Dep. 35:13–36:23); ECF No. 48-3 at 3; ECF No. 48-4 at 35–36 (Hudson Dep. 66:19–67–22). Critically, Hudson had loan documents memorializing the agreement between the Bank and PCI. *See* ECF No. 48-4 at 42 (Hudson Dep. 74:5–16); ECF No. 48-4 at 44–60. It blinks at reality to suggest that Hudson—already concerned about PCI's financial health, on notice of a UCC filing, and in possession of the Bank's security agreement reflecting its interest in PCI's accounts receivable and of PCI's debts owed—did not have sufficient facts from which to inquire further about the Bank and PCI's relationship. Day and Hudson, as sureties in the industry, certainly should have known the import of such arrangements.[7]

Day contends that summary judgment is inappropriate because Hudson's corporate designee testified that he "was not too concerned about a UCC filing" and that many contractors have lines of credit or UCC filings from various lending institutions; therefore, that PCI had such

---

[7]      Although Day asserts that "[the Bank] intentionally concealed its arrangements with PCI," undermining Hudson's and Day's ability to discover the wrongdoing, no record evidence supports this contention. ECF No. 53 at 25.

a relationship with the Bank alone did not trigger a need to investigate further. That this surety in general *chooses* not to investigate UCC filings or outstanding debts of its contractor does not undercut the Court's conclusion that, in all prudence, a reasonable surety concerned about the contractor's solvency would inquire about the Bank's rights, claims, or entitlements to the funds coming to PCI from the government. Hudson, in effect, assumed the risk that the Bank may lay claim to PCI's contract proceeds before Hudson's right to subrogation arose. *See Reliance Ins. Co.*, 143 F.3d at 507–08 (surety is not entitled to recover money previously disbursed by government to lender).[8]

Accordingly, when viewing all record evidence most favorably to Day and Hudson, Hudson's actual ignorance on this matter does not carry the day. Hudson possessed knowledge of *other* facts that would have caused a reasonably prudent person to inquire further. Hudson, therefore, was on inquiry notice of the lending arrangement—which could have been uncovered had Hudson made appropriate inquiry—as of October 2011.[9] *See Nettles*, 100 F.2d at 957. Day filed his initial Complaint in this matter on April 4, 2016. Because all claims are subject to a three-year limitations period, none survives.[10] Summary judgment is properly granted in the Bank's favor.

---

[8]    Day's reliance on *Finance Co. of America v. United States Fidelity & Guaranty Co.*, 277 Md. 177 (1976), is inapposite. That case concerned the priority of rights between a surety and a secured creditor for contract funds *not yet paid* and to which the surety and the creditor had filed competing claims, as opposed to contract funds already disbursed. *Id.* at 179–80.

[9]    Day argues that nothing supports a contention that Day or Hudson could have learned about the arrangement had they inquired. The Court cannot agree. When Hudson inquired more directly as to the lending arrangement during the indemnity litigation, it learned of the arrangement from the Bank itself.

[10]    The dispute as to whether a statute of limitations applies to Count II light of the purported subrogation to the Government is immaterial, because, as discussed above, any subrogation excludes the right Day attempts to assert.

**IV.     Conclusion**

The claims Day asserts cannot be maintained against the Bank.  Day's alleged rights to relief either are made pursuant to rights that Day cannot assert; are brought for conduct for which the Bank is not liable; or seek remedies to which Day is not entitled.  Moreover, Hudson, to whose rights Day succeeds, was on inquiry notice of the lending arrangement between PCI and the Bank more than three years prior to the initiation of this lawsuit.  The Bank's motion is GRANTED.  A separate Order follows.


8/3/2018                                                                          /S/
Date                                                Paula Xinis
                                                    United States District Judge